[Cite as *In re M.W.*, 2019-Ohio-5012.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: M.W. | : | Appellate Case No. 28440 |
|  | : | Trial Court Case No. 2016-3566 |
|  | : | (Appeal from Common Pleas Court - Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of December, 2019.

. . . . . . . . . . .

MATHIAS H. HECK JR. by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Appellee Montgomery County Children Services

SARA M. BARRY, Atty. Reg. No. 0090909, 1139 Holly Avenue, Dayton, Ohio 45410
      Attorney for Appellant Mother

. . . . . . . . . . . .

HALL, J.

{¶ 1} Mother appeals from the trial court's decision and judgment entry overruling her objections to a magistrate's decision and awarding Father legal custody of their three-year-old child, M.W.

{¶ 2} In her sole assignment of error, Mother contends the trial court's award of legal custody to Father was "against the preponderance of the evidence and was an abuse of discretion."

{¶ 3} The record reflects that M.W. was born in July 2015. Montgomery County Children Services ("MCCS") filed a complaint in May 2016 alleging that the child was neglected and dependent due to Mother's "untreated mental health concerns, her substance abuse, her instability and her failure to provide for the basic needs of the child." (Doc. # 111 at 1.) MCCS later filed an amended complaint focusing on dependency. (Doc. # 104.) It alleged, among other things, that Mother had cognitive delays and "a long history of mental health problems and violent behavior." (*Id.*) In July 2016, the trial court adjudicated M.W. and the child's siblings dependent and awarded MCCS protective supervision. (Doc. # 102.) In its ruling, the trial court noted that the parties had stipulated to the facts contained in the amended complaint and to the disposition. (*Id.*) Thereafter, in June 2017, the trial court awarded legal custody of M.W. to a maternal aunt. (Doc. # 90.) The trial court then transferred temporary custody to a non-relative before later transferring temporary custody to MCCS. (Doc. # 66.) Following an extension of that temporary custody, MCCS moved for an award of legal custody to the paternal grandmother. After she obtained interim temporary custody, MCCS amended its motion and added a request for an award of legal custody to Father, who had established

paternity in January 2018. (Doc. # 28, 39, 50.) The matter proceeded to an August 2018 hearing before a magistrate. Based on the evidence presented, the magistrate filed an August 9, 2018 decision awarding Father legal custody with an initial six months of protective supervision. (Doc. # 17.) Mother filed objections and supplemental objections, which the trial court overruled. (Doc. # 3, 8, 16.) In its May 31, 2019 ruling, the trial court determined that awarding legal custody to Father, with parenting time for Mother, was in M.W.'s best interest. (Doc. # 3 at 7.) After setting forth the testimony presented to the magistrate and reciting the pertinent statutory best-interest factors, the trial court reasoned:

> After an independent review of the record and consideration of the applicable statutory factors, the Court concludes that it is in the child's best interest for legal custody to be granted to father, * * *. Mother has obtained employment, secured adequate housing, and has been engaged in mental health counseling. While Mother has made progress on her case plan objectives, concerns about Mother's ability to provide adequate care for the child still remain. The child was previously adjudicated dependent, and has been outside of Mother's home since April 2017. Mother's visitation with the child has been inconsistent. Mother has missed numerous visits with the child due to her work schedule. However, even before Mother began her employment, she was placed on a stipulation to arrive an hour early to her visits as a result of being continually late to visits. Mother also arrived late to the hearing after oversleeping, which she claims was caused by the medication that she is taking. Both the MCCS caseworker and a Deputy

testified about the inappropriate behaviors and outbursts that Mother has displayed at the Agency, in front of her children, as recently as a few weeks prior to the hearing. Mother has four children that are siblings to this child, none of which are in her care.

Since establishing paternity, Father has acquired adequate housing and income to support the child. Further, Father has been visiting with the child regularly, including overnight visits in his home. There have been no concerns raised about the child's visits with Father or her adaption to Father's home. Father and the child are bonded and the child appears to be well taken care of in his home. Although a home study for Father was still pending approval at the time of the hearing, the Agency and GAL expressed that there was no reason to believe that it would not pass. The Court also notes that the GAL recommends legal custody to Father. (Tr. 7, II). The GAL stated that she has visited the child at Father's house, the child has been there for a few months, and is doing well there. (Tr. 7, II). The GAL believes Father's home is safe and appropriate. (Tr. 7, II). The child does not have any special needs. (Tr. 20, II).

(*Id.* at 7.)

{¶ 4} In her assignment of error, Mother challenges the trial court's best-interest determination. The essence of her argument is that the trial court discounted her case-plan progress while overemphasizing her mental health and emotional outbursts to justify placing M.W. with Father, who only established a relationship with the child months earlier, who only recently had obtained appropriate housing, who had a criminal record,

and who lived with people that MCCS had not fully investigated. With regard to the statutory best-interest factors in R.C. 3109.04(F), Mother contends M.W. has expressed a preference to be with her. She also asserts that the child is bonded with her, that she cares for the child appropriately, that she has three other children who should be able to bond with M.W., and that her emotional outbursts were related to her missed visitation opportunities, which further demonstrates her bond with the child. Mother additionally argues that an MCCS caseworker stated Father would be an appropriate custodian for M.W. but had not completed a home-study or a thorough investigation. Mother also asserts that M.W. never had "lived with" Father at the time of the hearing, having only "done some in home visits." With regard to her mental health, Mother stresses that she has been in counseling and has been compliant with her medications. She again argues that her emotional outbursts were related to not being able to see M.W. or her other children. She contends the record contains no information about Father's mental health while also pointing out his criminal record. Finally, Mother claims the record is devoid of evidence concerning which parent would be most likely to honor parenting time or visitation.

{¶ 5} The law governing the trial court's legal-custody determination and our review of that decision is as follows:

R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" An award of legal custody "vests in the custodian the right to have physical care and control of the

child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(19).

When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). *See In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992-Ohio-144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interes[t]; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. R.C. 3109.04(F)(1)(c). * * *

"[W]hen determining whether or not to grant an individual or couple legal custody of a dependent child, a court can do so if it finds by a preponderance of the evidence that it is in the best interes[t] of the concerned child. Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " (Internal citations omitted.) *In re A. W.*, 2d Dist.

Montgomery No. 21309, 2006-Ohio-2103, ¶ 6, citing [*In re K.S.*], 2d Dist.

Darke No. 1646, 2005-Ohio-1912.

> We review the trial court's judgment for an abuse of discretion. *See*
> *In re C.F.*, 113 Ohio St.3d 73, 83, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48
> (applying abuse of discretion standard to trial court's findings under R.C.
> 2151.414); *In re A.M.*, 2d Dist. Greene No. 2009 CA 41, 2009-Ohio-6002,
> ¶ 9. Abuse of discretion implies that the court's attitude was unreasonable,
> arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217,
> 219, 450 N.E.2d 1140 (1983).

*In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 8-11.

{¶ 6} With the foregoing standards in mind, we find Mother's assignment of error to be unpersuasive. Having reviewed the record, including the hearing transcript, we see no abuse of discretion in the trial court's decision. The trial court's ruling reflects that it thoroughly and independently examined the testimony presented to the magistrate. (Doc. # 3 at 3-6.) The trial court also cited the statutory best-interest factors. (*Id.* at 7.) Although the trial court did not explicitly match each best-interest factor to the evidence pertaining to it, the trial court had no such obligation. The record need only reflect that the trial court "considered" the applicable best-interest factors. *In re T.L.W.*, 2d Dist. Montgomery No. 28363, 2019-Ohio-3118, ¶ 5; *In re G.B.*, 10th Dist. Franklin No. 04AP-1024, 2005-Ohio-3141, ¶ 17. Here the trial court stated that it had considered the best-interest factors, its analysis was consistent with its consideration of those factors, and the evidence supported its decision to award Father legal custody.

{¶ 7} MCCS caseworker Douglas Montgomery testified that he had been involved

with Mother and her family since January 2018. (Tr. Vol. II at 18-19.) He stated that Mother's case-plan objectives included obtaining/maintaining housing and income, completing and following recommendations from a parenting/psychological evaluation, obtaining counseling and treatment, and refraining from illegal drug use. (*Id.* at 23-24.) At the time of the August 8, 2018 hearing, Mother had maintained adequate housing for eight months. She also had maintained employment at McDonalds for one and one-half or two months. (*Id.* at 24.) Mother also had completed a parenting/psychological evaluation. (*Id.* at 26.) With regard to counseling and treatment, Mother began that process in January 2018. At the time of the hearing, she remained engaged in counseling and was taking medication. (*Id.* at 25-27.) She also had passed a random drug screen in July 2018. (*Id.* at 29.)

{¶ 8} Montgomery testified that one recommendation from the parenting and psychological evaluation was for Mother to maintain regular visitation with M.W., who was three years old at the time of the hearing. (*Id.* at 19, 27.) On that issue, Montgomery testified that Mother had struggled over the last one and one-half to two months, which coincided with her recent employment, an apparent source of some of the problem. (*Id.* at 27, 39-40.) Although the visits remained "monitored" at an MCCS facility, Montgomery described them as "appropriate." (*Id.* at 28.) Montgomery opined that it was in M.W.'s best interest for Father to have legal custody because the child had developed a "very good relationship" with Father while Mother continued to struggle with "explosive behaviors and getting overwhelmed." (*Id.* at 30.) Montgomery added that the agency was worried about Mother's "overarching years of just explosive behavior and how that looks and manifests in the future." (*Id.* at 44.) Montgomery also recognized the existence of an "affection" and

"bonding" between M.W. and Father. (*Id.* at 32.) Montgomery noted that Father recently had obtained custody of another daughter, who was "[v]ery well integrated" with M.W. to the point that they seemed like sisters. (*Id.* at 32.)

**{¶ 9}** Montgomery testified that Father's case-plain objectives included maintaining housing and income as well basic provisions for M.W. (*Id.* at 22.) At the time of the hearing, M.W. had been placed with her paternal grandmother. But the child "quite often" spent time with Father. (*Id.* at 19.) Father's housing was sufficient, and M.W. had been "doing overnights" with him there for several months. He also had maintained self-employment with adequate income as a barber and had provided for all of M.W.'s needs. (*Id.* at 21-23, 33.) According to Montgomery, MCCS had no concerns regarding Father. (*Id.* at 23.) The agency still was waiting for approval of a home study for Father, but the only problem was a delay in processing a fingerprint for Father's girlfriend because "[t]he system was down." (*Id.* at 37.)

**{¶ 10}** Another witness, Montgomery County Deputy Sheriff Jolene Holtz, elaborated on Mother's explosive behavior. Holtz testified that she was assigned to work at MCCS. (*Id.* at 9.) As part of her job, she sometimes interacted with parents who came to the facility to visit their children. (*Id.* at 10.) Holtz became aware of Mother because of Mother's erratic behavior. (*Id.* at 10-11.) The most recent incident involved Mother becoming "overwhelmed" with all of her children when one of them fell and injured himself. (*Id.* at 11.) Holtz recalled multiple other occasions when Mother was "erratic, and yelling and screaming, and threatening." (*Id.* at 11-12.) They most often occurred when Mother arrived late and did not get her visit. (*Id.*) Holtz explained: "Whenever she's late, she gets angry and she demands to have her children. You can't talk to her; she won't listen. She

understands she has to be there on time. And she just—she's very erratic, irrational, and yells and screams." On at least one occasion, Mother's "outburst" lasted about 20 minutes before she settled down and then "erupted a couple more times[.]" (*Id.* at 13.) Holtz added that "[a]ny time she's—she doesn't get what she wants, she throws a tantrum and screams and yells and threatens." (*Id.* at 17.) In Holtz's opinion, Mother "doesn't have any parenting skills[.]" (*Id.* at 15.)

{¶ 11} In addition to MCCS caseworker Montgomery, guardian ad litem Amy Ferguson also recommended awarding legal custody to Father. Before leaving the hearing to appear at another proceeding, Ferguson stated: "I did have an opportunity to investigate the case independently. I have visited the child at [Father's] house. She's been there for a few months now. She is doing very well there. The home is safe and appropriate, and my recommendation is legal custody to the father." (*Id.* at 7.)

{¶ 12} The final two witnesses at the hearing were Father and Mother. Father expressed sadness at missing the first two years of M.W.'s life. He added: "And I refuse to miss any more time. I have four girls. She's my youngest. The things I've done for them other three, she deserves as well. And I feel like she's better off with me because I can give it to her." (*Id.* at 46.) Father testified that he loved M.W. and that he had toys for her and a place to sleep. (*Id.* at 46-47.) With regard to MCCS' delay in approving his home study, Father explained that the agency was awaiting the processing and return of a fingerprint card for his girlfriend to check for a criminal record. Father stated that his girlfriend worked as a nurse and that she did not have a felony record. (*Id.* at 47-48.) Father was unaware of her having any misdemeanors or traffic offenses either. (*Id.* at 48.) As for his own record, Father acknowledged that he was on unsupervised parole or

probation for an out-of-state theft offense. (*Id.* at 49-50.) Father did not serve any prison time for the theft, and he expected his probation or parole to end within two or three months. (*Id.*) Father also had an older robbery conviction that occurred before he had any children and for which he no longer was under any sanction. (*Id.*)

{¶ 13} For her part, Mother testified that she had maintained appropriate housing for eight months. She remained in a probationary period with her full-time job at McDonalds because she had not yet completed 90 days. (*Id.* at 52-53.) Mother acknowledged missing some visits with her children because she had to work. (*Id.* at 54.) She expected to have more scheduling flexibility at work after her probationary period ended. (*Id.* at 55.) Mother testified that she had been attending counseling for six or seven months, missing only when she had to work. (*Id.* at 56.) She also had been compliant with her medication and had passed a drug screen. (*Id.* at 56-57.) Mother agreed that M.W. was doing well in Father's care and that the child was spending every night with him. (*Id.* at 74, 76.) Mother wanted legal custody of M.W., however, because of her bond with the child. (*Id.* at 74.) Mother explained that she loved her children and had worked hard toward regaining custody of them. Mother stated that she had done, or was trying to do, everything MCCS had asked of her. (*Id.* at 66-67, 74-75.) Mother also discussed the most recent incident at the MCCS visitation facility when one her children fell and cut his mouth. Mother testified that she became "overwhelmed" and "panicked" because the child was bleeding. (*Id.* at 62.)

{¶ 14} Based on our review of the evidence, it appears that Mother and Father both substantially had completed their case-plan objectives. Both also appear to have established a bond with M.W. The record reflects that MCCS had no concerns about

Father's ability to care for M.W., who had been spending the night with him and was doing well. Mother herself testified that she did not believe Father was "not properly caring for her or anything like that." (*Id.* at 74.) It appears that MCCS' primary lingering concern about Mother was her continuing demonstrations of "erratic" and "explosive" behavior at the visitation facility. Partly for this reason, MCCS recommended legal custody to Father. As set forth above, the guardian ad litem did likewise. Although Mother attributed her outbursts to her bond with her children and her frustration at visits being denied due to tardiness, the trial court acted within its discretion in taking Mother's behavior at the visitation center into consideration when assessing her mental health and her ability to handle the stress of caring for M.W. In short, we do not find that the trial court abused its discretion in awarding Father legal custody with six months of protective supervision while awarding Mother parenting time. (Doc. # 3 at 7-8.)

{¶ 15} Mother's assignment of error is overruled, and the judgment of the Montgomery County Common Pleas Court, Juvenile Division, is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck Jr.
Sarah E. Hutnik
Sara M. Barry
Hon. Helen Wallace